OPINION OF THE COURT
Chief Judge Wachtler.
Thomas Bengston, the defendant in this libel action, is a newspaper reporter and the author of an article which appeared in the sports section of the October 3, 1983 edition of the Adirondack Daily Enterprise, a newspaper published by defendant Adirondack Publishing Company. The article was critical of the conduct of plaintiff Jeremiah Mahoney, a high school football coach, during a football game between Mahoney’s St. Lawrence Central High School team and a team from Tupper Lake. Mahoney commenced this libel action against Bengston and the newspaper publisher, claiming that portions of the article were false and that their publication harmed his reputation as a coach and educator. After a jury trial, during which he conceded that he was a public figure, Mahoney was awarded compensatory and punitive damages. The Appellate Division affirmed the ensuing judgment insofar as it awarded compensatory damages, but struck the award of punitive damages (123 AD2d 10). We granted defendants’ motion and plaintiffs cross motion for leave to appeal (69 NY2d 609) to determine whether the Appellate Division erred in either respect.
 The dispositive issue is whether plaintiff proved by clear and convincing evidence that the defendants published the false portions of the article with "actual malice” — that is, *36 knowing they were false or subjectively entertaining serious doubt as to their truth (see, Bose Corp. v Consumers Union, 466 US 485, 511, n 30; St. Amant v Thompson, 390 US 727, 731; New York Times Co. v Sullivan, 376 US 254, 280).[1] We conclude that plaintiff did not meet this burden of proof. The complaint should, therefore, be dismissed, and the Appellate Division order, insofar as appealed from by defendants, should be reversed. Plaintiff’s cross appeal, challenging the Appellate Division’s vacatur of punitive damages, is thus academic and must be dismissed.
The football game described in the article took place on Saturday, October 1, 1983, at the Tapper Lake High School field. Both teams were winless going into the game, but the Tapper Lake Lumberjacks emerged with a 31-7 victory. Defendant Bengston, a reporter and the sports editor for the Daily Enterprise, observed the game from the stands behind the St. Lawrence team’s bench. He sat in the top row of the stands, near midfield, approximately 30 feet from the bench. After the game he prepared the story which became the subject of this action.
The article appeared in the Monday edition of the paper. In addition to describing the contest on the field, Bengston reported extensively on the St. Lawrence coach’s actions along the sidelines and in his team’s locker room after the game. Bengston reported that, although the St. Lawrence team lost the game on the field, "Larries coach Jerry Mahoney showed himself to be the big loser.” According to the article, Mahoney "cursed and belittled his players from the sidelines throughout the game” and "screamed at his players so loudly in the locker room after the game that he easily could be heard by embarrassed fans outside the school building.” The "verbal abuse” directed at the players was reportedly mixed with *37 profanities, and the events, according to Bengston, offered "a dark glimpse of high school football coaching.” The story also contained the following passage which, as the trial developed, became the focal point of the action: "Larries quarterback Kevin Hartson completed 14 passes and was intercepted six times. Each time Hartson came off the field after throwing an interception, he was greeted by Mahoney or an assistant coach with 'Come on, get your head out of your &!(!!(&.[2] Play the game.’ ”
Plaintiff commenced this libel action, contending that the account of his conduct was false and had damaged his reputation. During the trial, plaintiff admitted that he had used the words "hell,” "damn,” and "goddamn” in reprimanding his team during and after the game. Thus, the trial court dismissed, for lack of proof of falsity, plaintiff’s claim as to those portions of the article that described him as having screamed and used profanities toward his players.
The trial court ruled, however, that plaintiff had established a prima facie case with respect to that portion of the article which reported that plaintiff had told his quarterback, "get your head out of your &!(!!(&.” The jury awarded plaintiff $10,000 in compensatory damages, finding that this portion of the article was false and defamatory and that defendants had published it with actual malice — either knowing it was false or with reckless disregard for whether it was false. The jury also awarded plaintiff $5,000 in punitive damages after finding that defendants had acted with common-law malice — that is, with a desire to harm plaintiff or reckless disregard for the injurious effect the article would have upon him (see, Corrigan v Bobbs-Merrill Co., 228 NY 58, 66-67).
The Appellate Division ruled that there was insufficient evidence of common-law malice and therefore disallowed the award of punitive damages. The court upheld the award of compensatory damages, however, concluding that the evidence was sufficient to sustain the jury’s findings that the report was false, defamatory and published with actual malice.
We agree with the Appellate Division that the evidence at trial was sufficient to meet plaintiff’s burden of proving that the critical portion of the article was false (see, Philadelphia Newspapers v Hepps, 475 US 767 [public figure plaintiff must bear burden of proving falsity in libel action]). Game *38 officials testified that they did not observe any unsportsmanlike conduct, including the use of profanities, by plaintiff. Plaintiff and Hartson, the quarterback, testified that plaintiff actually said, encouragingly, "Get your head up” or "Keep your head up.” Plaintiff’s wife and the quarterback’s father, both spectators at the game with a vantage point equal to or better than Bengston’s, testified that they did not hear the offensive language. The quarterback’s father affirmed that his son had been told by the coach to "[g]et his head up.” The coach of the St. Lawrence cheerleaders, who had watched the game from a point about 25 or 30 feet from plaintiff’s position on the sideline, testified that she heard no foul language from Mahoney. Thus, there was strong evidence that plaintiff did not make the statements attributed to him in this portion of the article.
We also agree with the Appellate Division that the false portion of the article was reasonably susceptible of a defamatory meaning (see, Silsdorf v Levine, 59 NY2d 8, 12-13; James v Gannett Co., 40 NY2d 415, 419). Although it might be argued that the quoted language is not unexpected or out of character for a football coach, the thrust of the article was to the contrary — that such conduct should be condemned. The false attribution of such language to the plaintiff, when viewed in the context of the article as a whole, cast doubt on the plaintiff’s fitness for his profession. It cannot be said, therefore, that the excerpt was not defamatory as a matter of law.
That the story was false and defamatory, however, is not enough to sustain plaintiff’s claim. The law governing defamation actions is overlaid with a network of constitutionally based rules reflecting our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open” (New York Times Co. v Sullivan, 376 US 254, 270, supra). The rules are grounded in the First and Fourteenth Amendments and place significant restrictions on the ability of the States to fashion remedies for harm caused by defamatory publications, to ensure that fear of liability will not chill important free speech and free press rights and cause self-censorship. These protections vary considerably in scope and content depending on such factors as whether the plaintiff is a public official, public figure or private individual (see, Gertz v Robert Welch, Inc., 418 US 323, 342-343); whether the defamatory statements involve an issue of public concern (see, Dun & Bradstreet v Greenmoss Bldrs., *39 472 US 749, 758-761); and, perhaps, whether or not the defendant is a member of the media (see, LeBel, Reforming the Tort of Defamation: An Accommodation of the Competing Interests Within the Current Constitutional Framework, 66 Neb L Rev 249, 280-282 [discussing conflicting signals on this point emanating from Dun & Bradstreet v Greenmoss Bldrs., supra, and Philadelphia Newspapers v Hepps, 475 US 767, supra]).
Plaintiff’s concession at trial — that he is a "public figure” for purposes of this action — triggered three of these constitutionally based rules of immediate relevance. First, plaintiff was required to prove that the defamatory statements were published with actual malice (see, Curtis Publ. Co. v Butts, 388 US 130; New York Times Co. v Sullivan, supra). Second, actual malice had to be established by clear and convincing evidence (see, Bose Corp. v Consumers Union, 466 US 485, 511, n 30, supra). Third, appellate review must include an independent review of the evidence germane to the actual-malice determination to ensure that the determination rests upon clear and convincing evidence (see, id., at 514, n 31).
It is the third rule which compels this court, usually constrained to review only the law and without the power to disturb affirmed findings of fact, to review the evidence of actual malice. There was no direct evidence that Bengston or his employer knew or suspected the plaintiff did not utter the words attributed to him in the article. The only evidence of actual malice is the inference to be drawn from the proof that plaintiff in fact said something else to his quarterback. The logic advanced by plaintiff to support this inference is that, because Bengston was present, he must have known the true events and his erroneous account, therefore, must have been a deliberate falsehood. Under the circumstances presented, we conclude that this inference does not supply the clear and convincing evidence required to show that defendants knew the account was false or entertained doubt as to its truth.
Falsity and actual malice are distinct concepts. It is one thing to publish a false statement and quite another to do so knowingly or recklessly (see, Bose Corp. v Consumers Union, 466 US 485, 511, supra). It may be possible, as the United States Supreme Court has suggested, that proof of falsity will support an inference of actual malice "when the alleged libel purports to be an eyewitness or other direct account of events that speak for themselves” (Time, Inc. v Pape, 401 US 279, 285). The Appellate Division held that this case presented *40 such an instance. We disagree. The inference depends for its validity on the premise that the eyewitness could not have perceived and understood anything but the truth. Thus, in reporting something else, the observer must have departed from the truth by design. The underlying premise is valid, however, only if the events were unambiguous and the setting was such that the observer could not have misperceived those events. Such conditions, however, cannot simply be assumed; as the proponent of the inference and the bearer of the burden of proof of actual malice, the plaintiff must demonstrate that they exist. No such showing was made here.
The evidence was that Bengston observed the events some 30 feet from where they took place. The exchanges he reported between plaintiff and the quarterback occurred after plaintiff’s visiting team had delivered the ball into the hands of the home team, an event likely to excite the home crowd. It is probable, then — at least plaintiff did not show otherwise— that Bengston’s opportunity to hear the exchanges was less than ideal.
It is significant that the only witnesses who claimed to know what plaintiff actually said were plaintiff himself, the quarterback to whom he had spoken and the quarterback’s father. The other witnesses simply testified that they did not hear plaintiff use profane language. Plaintiff and the quarterback were obviously in a better position than Bengston to know what was said. The quarterback’s father sat about the same distance away as Bengston. All of this evidence supports the finding that Bengston’s report was inaccurate, but it does not lead to the conclusion that Bengston knew that it was false. There was no evidence to negate the possibility that Bengston simply misunderstood plaintiff. There was not, for example, testimony that plaintiff’s words were clearly audible to anyone in Bengston’s location.
Furthermore, the similarity between Bengston’s account ("get your head out of your &!(!!(&”) and plaintiff’s account ("get your head up”) suggests that the falsity was more the product of misperception than fabrication. In sum, we conclude that plaintiff failed to establish that the situation was sufficiently unambiguous to support the inference that the false statement was published with actual malice.
The absence of clear and convincing evidence of actual malice is fatal to plaintiff’s complaint. The question whether the award of punitive damages was properly stricken is, *41 therefore, academic. Thus, we have no occasion to consider whether plaintiffs proof of common-law malice was sufficient to sustain such an award or whether punitive damages are ever recoverable in libel actions involving matters of public concern (see, Dun & Bradstreet v Greenmoss Bldrs., 472 US 749, 761, supra; Gertz v Robert Welch, Inc., 418 US 323, 349, supra; see generally, Committee Report, Punitive Damages in Libel Actions, 42 Record of Assn of Bar of City of NY 20 [1987]).
Accordingly, plaintiffs cross appeal should be dismissed as academic and the Appellate Division order, insofar as appealed from, should be reversed and the complaint dismissed.
Judges Simons, Kaye, Alexander, Titone, Hancock, Jr., and Bellacosa concur.
On defendants’ appeal, order insofar as appealed from reversed, with costs, and complaint dismissed. Plaintiffs cross appeal dismissed, with costs.

. The term "actual malice” has been criticized as an inappropriate label for this state-of-mind requirement because it employs a term (malice)— commonly understood to mean hostility or ill will toward another person-— to describe something quite different: the state of mind of the defendant with respect to the truth or falsity of the statements made (see, Herbert v Lando, 441 US 153, 199-200 [Stewart, J., dissenting]; Nowak, Rotunda and Young, Constitutional Law, at 945-946 [2d ed 1983] [suggesting that "scienter” is a more accurate label]; LeBel, Reforming the Tort of Defamation: An Accommodation of the Competing Interests Within the Current Constitutional Framework, 66 Neb L Rev 249, 254-255, & n 23 [1987]). Although this criticism is not without foundation, the term of art is now firmly entrenched in the literature and case law on the subject and will therefore be employed in this opinion.

2. This is the form in which the quotation appeared in the article.