John Prozeralik, Respondent, v Capital Cities Communica-
tions, Inc., Appellant.

Fourth Department, February 5, 1993

## APPEARANCES OF COUNSEL

*Jaeckle, Fleischmann & Mugel,* Buffalo *(Floyd Abrams* of counsel), and *Cahill, Gordon & Reindel,* New York City, for appellant.

*Frank R. Bayger,* Buffalo *(Richard Sullivan* of counsel), and *Sullivan, Benatovich, Oliverio & Trimobli,* Buffalo, for respondent.

*Rogers & Wells,* New York City *(Richard N. Winfield* of counsel), for Advance Publications, Inc., and others, *amici curiae.*

## OPINION OF THE COURT

GREEN, J.

On May 7, 1982, a television station and a radio station

owned by defendant broadcast reports falsely identifying plaintiff as the victim of an abduction and beating that occurred the previous evening. The reports also incorrectly stated that the F.B.I. was investigating the possibility that plaintiff owed money to organized crime. Plaintiff, a prominent Niagara Falls businessman, commenced this defamation action shortly after the broadcasts. Following a jury trial, plaintiff was awarded $18,474,525 in compensatory and punitive damages. The court on motion reduced the award for financial loss by remittitur, leaving the amount of $15,487,525.

## I

■ The primary issue on appeal is whether plaintiff, a public figure, proved by clear and convincing evidence that the false statements were published with "actual malice" (*Mahoney v Adirondack Publ. Co.*, 71 NY2d 31, 39; *Bee Publs. v Cheektowaga Times*, 107 AD2d 382, 383). In determining whether plaintiff met his burden, we must " 'independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of "actual malice" ' " (*Harte-Hanks Communications v Connaughton*, 491 US 657, 686, quoting *Bose Corp. v Consumers Union*, 466 US 485, 511). Our independent examination of the record necessarily includes an examination of " 'the statements in issue and the circumstances under which they were made to see * * * whether they are of a character which the principles of the First Amendment * * * protect' " (*Harte-Hanks Communications v Connaughton, supra,* at 688, quoting *New York Times Co. v Sullivan*, 376 US 254, 285). After reviewing the record, we conclude that plaintiff met his burden of proving that defendant acted with "actual malice."

The false identification of plaintiff as the victim of a mob-related abduction and beating was spawned in the newsroom of WKBW-TV Channel 7 (Channel 7) on the morning of May 7, 1982. The previous evening the station had reported that a man had been taken to the Howard Johnson's Motel in Cheektowaga and beaten, possibly because the victim owed money to organized crime. Although the Cheektowaga police and the F.B.I. refused to release the victim's name, the station's competitor, Channel 4, correctly identified the victim as David Pasquantino on its 11 o'clock newscast on May 6, 1982. When Channel 7 employees arrived at the newsroom on the

morning of May 7, the conversation focused on the identity of the victim of the Cheektowaga motel beating. Someone had heard a name on the radio, and it "came up in conversation" that the victim was a prominent restaurateur. Channel 7 assignment manager Nancy Sanders wondered aloud if the victim was plaintiff, John Prozeralik, because plaintiff was a well-known restaurateur and his was "the first name that came to mind."

Inspired by Sanders' conjecture, Channel 7 news director Bruce Corris directed reporter Cindy DiBiasi "to run that name past the F.B.I." DiBiasi telephoned Special Agent John Thurston and asked him to name the victim of the Cheektowaga motel beating. Thurston and DiBiasi gave conflicting accounts of the conversation. Thurston maintained that he did not know the name of the victim when DiBiasi called and that he flatly refused to confirm or deny any name. According to DiBiasi, when she gave Thurston the name John Prozeralik, he replied, "Okay. You can go with that unless I call you back."

DiBiasi completed her story and read the following script on Channel 7's noon news:

"The F.B.I. is investigating a beating and abduction in Cheektowaga last night.

"Today, investigators are questioning John Prozeralik, the owner of John's Flaming Hearth Restaurant in Niagara Falls, New York.

"Prozeralik was either tricked or forced to the Howard Johnson's in Cheektowaga according to police where he was beaten with a baseball bat or pipe and tied up.

"Today the F.B.I. is investigating the possibility that Prozeralik owed money to organized crime.

"Investigators are looking for two suspects * * * sources say one of the men is from Florida."

Based upon the information obtained in the television broadcast, WKBW Radio aired reports at 12:45, 1:45 and 2:45. The three radio broadcasts essentially repeated Channel 7's account.

After plaintiff learned of the broadcasts, he instructed his attorneys to call Channel 7 and WKBW Radio to inform the stations of their mistake and to demand retractions. Plaintiff also called Channel 7 news director Steven Ridge requesting a retraction. Ridge refused to retract the story, but he instructed DiBiasi to confirm plaintiff's name with Special

Agent Thurston and directed investigative reporter John Pauley to seek confirmation from other sources.

By the late afternoon of May 7, Channel 7 was convinced that it had falsely identified plaintiff as the victim of the abduction and beating. Thurston informed Ridge that the F.B.I. was not investigating plaintiff and that he had never confirmed plaintiff's name in any way during his earlier telephone conversation with DiBiasi. Ridge also learned, through DiBiasi and Pauley, that the victim was in fact David Pasquantino.

Ridge drafted the following "retraction", which was broadcast on Channel 7's 6 o'clock news and essentially repeated on the 11 o'clock news:

"Tonight, we have developments on two fronts in the abduction that ended yesterday in a Cheektowaga motel.

"First, the victim is not, and I repeat, is not, John Prozeralik, the operator of John's Flaming Hearth Restaurants.

"The F.B.I. earlier today said and confirmed the victim was Prozeralik, but our independent investigation is revealing he was not involved.

"The actual victim is David Pasquantino, a Wheatfield restaurant owner who lawmen say is associated with bookmaking.

"Sources are telling us Pasquantino was abducted from the restaurant after he fell behind in payments of a 30 thousand dollar loan from a Florida underworld figure.

"An arrest warrant is out for one of Pasquantino's abductors tonight."

The evidence of the circumstances surrounding defendant's broadcasts establishes, with convincing clarity, that defendant made the false statements concerning plaintiff "with 'actual malice'—that is, knowing they were false or subjectively entertaining serious doubt as to their truth *(see, Bose Corp. v Consumers Union,* 466 US 485, 511, n 30; *St. Amant v Thompson,* 390 US 727, 731; *New York Times Co. v Sullivan,* 376 US 254, 280)" *(Mahoney v Adirondack Publ. Co.,* 71 NY2d 31, 35-36, *supra).* Contrary to defendant's contention, the reports naming plaintiff as the victim of the Cheektowaga motel beating were not the product of a "misunderstanding" *(cf., Mahoney v Adirondack Publ. Co., supra,* at 40). Rather, the misidentification of plaintiff was the result of groundless speculation and conjecture in the Channel 7 newsroom. The use of plaintiff's name was not based upon an innocent mis-

take but upon a clear fabrication. John Prozeralik's name was falsely associated with organized crime and loansharking because it "was the first name that came to mind" when Channel 7 learned that the victim was a prominent restaurateur.

The record supports the jury's decision, implicit in its verdict, to credit Thurston's testimony that he did not confirm plaintiff's name in any way and that he never told DiBiasi that she could "go with" plaintiff's name unless he called her back. Because the false identification of plaintiff was nothing less than an unsubstantiated fabrication that the F.B.I. refused to confirm, the noon news broadcast was clearly made with a " 'high degree of awareness of * * * probable falsity' " *(Harte-Hanks Communications v Connaughton,* 491 US 657, 667, *supra,* quoting *Garrison v Louisiana,* 379 US 64, 74).

Defendant cannot avoid liability for WKBW Radio's republication of Channel 7's defamatory statement, because the original publisher and the republisher are part of the same enterprise, owned by defendant *(see, Karaduman v Newsday, Inc.,* 51 NY2d 531, 553; *see also,* 44 NY Jur 2d, Defamation and Privacy, § 51). "Any publication, whenever made, by the corporation must be judged in the light of *all* relevant corporate activity" *(Karaduman v Newsday, Inc., supra,* at 553 [emphasis added]). Because the original television broadcast was made with actual malice, defendant is responsible for its republication on WKBW Radio.

The record demonstrates that defendant also acted with actual malice in broadcasting the purported retractions on Channel 7's 6 and 11 o'clock news. We reject defendant's contention that the trial court improperly instructed the jury that the final two television broadcasts contained false statements as a matter of law. Based upon the undisputed evidence at trial, the jury could not find by any rational process that defendant's statement, "The F.B.I. earlier today said and confirmed the victim was Prozeralik", was true (see, CPLR 4401; *Van Syckle v Powers,* 106 AD2d 711, 713). The statement, read in context, cannot reasonably convey any meaning other than that the F.B.I had named plaintiff as the victim and subsequently confirmed its identification. Although the record contains conflicting evidence concerning the communications between DiBiasi and Special Agent Thurston, the witnesses agreed that the F.B.I. never named Prozeralik as the victim. Contrary to the statement in the "retraction," the original source of Channel 7's misinformation was not the

F.B.I., but newsroom speculation. Because the record conclusively establishes that the "retractions" contain false statements, the trial court properly instructed the jury that it need not consider the falsity of the statements. As the Court of Appeals observed in *Crane v New World Tel. Corp.* (308 NY 470, 479-480): "A court, it is fundamental, should never take from a jury doubtful questions of fact, but it is equally basic that a court shirks its duty if it creates an issue, when none exists, solely to foist decision upon a jury."

Plaintiff met his burden of proving by clear and convincing evidence that defendant made the false statements in the "retractions" with actual malice. By the time the final two television broadcasts aired, Channel 7's news director Ridge knew that the F.B.I. never said that plaintiff was the victim of the abduction and beating. DiBiasi had told Ridge that Thurston did not know the name of the victim at the time of her first phone call. Further, Thurston informed Ridge that he did not confirm plaintiff's name in any way and that DiBiasi's account of her telephone conversation with him was untrue. The circumstances under which the final broadcasts were made clearly support the jury's determination that Ridge entertained serious doubts as to the truth of the statement that the F.B.I. "said and confirmed" that plaintiff was the victim of the mob-related beating. The statements were made with "knowledge that [they were] false or with reckless disregard of whether [they were] false or not" *(New York Times Co. v Sullivan,* 376 US 254, 280, *supra).*

## II

■ Defendant's remaining contentions relate to the damages awarded to plaintiff. We reject defendant's argument that the jury's award of $4 million for humiliation, mental anguish and injury to plaintiff's reputation is excessive. The question of the amount of damages to be awarded in defamation actions is peculiarly within the jury's province *(see, Toomey v Farley,* 2 NY2d 71, 83; 44 NY Jur 2d, Defamation and Privacy, § 135), and nothing in the record leads us to conclude that the award "deviates materially from what would be reasonable compensation" for plaintiff's injuries (CPLR 5501 [c]). Before the defamatory broadcasts, plaintiff was a respected business and civic leader in Niagara Falls. Plaintiff owned four restaurants, two hotels and a meat-packing business and was in the final stages of developing Air Niagara, an airline that was to

serve the tourist industry in Niagara Falls. His active social and professional life was based upon service to a community that relied upon his good character and reputation. After defendant's broadcasts, plaintiff's name was tainted with a connection to organized crime and loansharking. As a result, plaintiff's customers and the investors in Air Niagara withdrew their financial support and lost their faith in plaintiff's integrity. The jury's award represents reasonable compensation for humiliation, mental anguish and injury to plaintiff's reputation. Further, defendant does not challenge the award of $1,487,525 as damages for plaintiff's direct financial loss, which was reduced upon remittitur from $4,474,525.

In addition to the awards for injury to reputation and the direct financial loss sustained by plaintiff as the result of the defamatory broadcasts, the jury awarded $10 million in punitive damages. We reject defendant's contention that any award of punitive damages in a public figure libel case violates the free press guarantees of the Federal and State Constitutions *(see,* US Const 1st Amend; NY Const, art I, § 8). When a defamatory publication involves a matter of public concern, punitive damages may not be awarded, consistent with constitutional principles, absent a showing of actual malice *(see, Gertz v Robert Welch, Inc.,* 418 US 323, 349; *O'Brien v Troy Publ. Co.,* 121 AD2d 794, 796). In the area of unprotected speech, where actual malice has been demonstrated by clear and convincing evidence, punitive damages may be awarded.

Contrary to defendant's contention, plaintiff was not required to establish defendant's conscious ill will toward him to sustain the award of punitive damages *(see generally, Liberman v Gelstein,* 80 NY2d 429 [distinction between common-law malice and "actual malice" under the *New York Times* standard]). Rather, an award of punitive damages may be justified if the evidence establishes defendant's indifference to plaintiff's rights, manifested by a reckless disregard of the truth or falsity of its statements *(see, Corrigan v Bobbs-Merrill Co.,* 228 NY 58, 67; PJI 3:30 [1992 Supp]).

The determination of "[w]hether to award punitive damages in a particular case, as well as the amount of such damages, if any, are primarily questions which reside in the sound discretion of the original trier of the facts" and should not be lightly disturbed *(Nardelli v Stamberg,* 44 NY2d 500, 503; *see also, Toomey v Farley,* 2 NY2d 71, 83, *supra).* In our view, $10 million represents an appropriate amount to deter defendant,

a multibillion dollar enterprise, from repeating its reckless conduct *(see, Toomey v Farley, supra,* at 83).

In concluding that the judgment should be affirmed, we are mindful of " 'the consistent tradition in this State of providing the broadest possible protection to "the sensitive role of gathering and disseminating news of public events" * * * [which] call[s] for particular vigilance by the courts of this State in safeguarding the free press against undue interference' " *(Immuno AG. v Moor-Jankowski,* 77 NY2d 235, 249, *cert denied* — US —, 114 L Ed 2d 713, quoting *O'Neill v Oakgrove Constr.,* 71 NY2d 521, 528-529). We are also concerned that large libel judgments may have a chilling effect on the full and unfettered expression of ideas. The broad cloak of protection afforded the press under the State and Federal Constitutions, however, does not extend to the reckless and irresponsible infliction of injury by defendant. We recognize the difficulties in striking an appropriate balance " 'between the need for vigorous public discourse and the need to redress injury to citizens wrought by invidious or irresponsible speech' " *(Immuno AG. v Moor-Jankowski,* 77 NY2d 235, 248, *supra,* quoting *Milkovich v Lorain Journal Co.,* 497 US 1, 14). By requiring defendant to answer in damages for falsely identifying plaintiff when it had "knowledge that [the report] was false or * * * reckless disregard of whether it was false or not" *(New York Times Co. v Sullivan,* 376 US 254, 280, *supra),* the judgment reflects the "appropriate balance."

Accordingly, the judgment should be affirmed.

LAWTON, J. (dissenting). I respectfully dissent. Defendant contends that the trial court improperly instructed the jury that Channel 7's 6 and 11 o'clock broadcasts contained false statements as a matter of law. The majority rejects that contention, concluding that the statement in defendant's retraction that "[t]he F.B.I. earlier today said and confirmed the victim was Prozeralik" was false because no witness testified that the F.B.I. "named Prozeralik as the victim" of the attack. That conclusion ignores the testimony by reporter Cindy DiBiasi that, when she asked F.B.I. Agent Thurston whether he could confirm that Prozeralik was the victim, he replied, "Okay. You can go with that unless I call you back." If one credits DiBiasi's testimony, Thurston's response to DiBiasi's question demonstrated agreement with the reporter's statement and advised her, i.e., stated and confirmed, that the victim was Prozeralik. Although Thurston did not necessarily

state that "Prozeralik was the victim" of the attack, the import of DiBiasi's testimony was that Thurston confirmed that Prozeralik was the victim. By ruling as a matter of law that the 6 and 11 o'clock broadcasts were false, Supreme Court removed from the jury's consideration the crucial issue of the substance of the Thurston-DiBiasi conversation. In doing so, the court usurped the jury's responsibility to resolve issues of credibility and seriously undermined DiBiasi's credibility. Because the resolution of the issue of DiBiasi's credibility was inextricably linked with all plaintiff's causes of action, a new trial is required.

Additionally, I conclude that plaintiff failed to meet his burden of proving by clear and convincing evidence that defendant's 6 and 11 o'clock retractions were made with actual malice. At the time of the 6 and 11 o'clock broadcasts, Channel 7's news director, Steven Ridge, had been advised that plaintiff was not the victim of the assault. In those broadcasts, that fact is keynoted when it was stated, "First, the victim is not, and I repeat, is not, John Prozeralik, the operator of John's Flaming Hearth Restaurants." The broadcasts went on to state, however, that "[t]he F.B.I. earlier today said and confirmed the victim was Prozeralik". At the time of the 6 and 11 o'clock broadcasts, Ridge was aware that Agent Thurston had denied having ever confirmed to DiBiasi that Prozeralik was the victim. Ridge also testified, however, that DiBiasi insisted that Thurston had confirmed to her that Prozeralik was the victim. Ridge further testified that he believed that Thurston had misled DiBiasi. Given those circumstances, plaintiff failed to prove by clear and convincing evidence that Ridge believed that his statement that the F.B.I. had earlier confirmed that plaintiff was the victim was inaccurate at the time he published it. Plaintiff failed, therefore, to establish actual malice (see, e.g., Bose Corp. v Consumers Union, 466 US 485, 511-513; Rinaldi v Holt, Rinehart & Winston, 42 NY2d 369, 383, cert denied 434 US 969), and his fourth and fifth causes of action, arising from the 6 and 11 o'clock broadcasts, must be dismissed.

Regarding the jury's award of damages, I conclude that the jury's award of $4 million for damages to plaintiff's reputation and for his humiliation and mental anguish is excessive. The record establishes that the broadcasts concerning plaintiff immediately made him the "talk of the town," but that notoriety quickly dissipated. Indeed, the record shows that public discussion quickly shifted to plaintiff's defamation ac-

tion against defendant. It further shows that most individuals who heard the broadcasts did not believe that plaintiff was involved in organized crime. Given those circumstances, although plaintiff was a respected business and civic leader, the jury's $4 million award for humiliation, damage to reputation and mental anguish deviated materially from that which would be reasonable compensation and was excessive *(see,* CPLR 5501 [c]; *see, e.g., Dalbec v Gentleman's Companion,* 828 F2d 921 [2d Cir 1987]).

Nor can I agree with the majority's upholding the jury's award of $10 million in punitive damages. A question exists whether punitive damages can be awarded in the absence of proof of common-law malice, i.e., proof that defendant's actions were based on spite or ill will with a desire to harm the plaintiff *(see, Mahoney v Adirondack Publ. Co.,* 71 NY2d 31, 41; *Wood v Lee,* 41 AD2d 730, 731). Here, the record is devoid of any proof of common-law malice. In any event, I conclude that the award is excessive. An award of punitive damages in a libel case involving a public figure is subject to strict judicial scrutiny in view of its inhibiting effect on the news media *(see, Gertz v Robert Welch, Inc.,* 418 US 323, 350). An award of $10 million in this case is unconscionable and dramatically exceeds awards made in comparable defamation actions brought by public figures in New York *(see, e.g., Goldwater v Ginzburg,* 414 F2d 324 [2d Cir], *cert denied* 396 US 1049; *Maule v NYM Corp.,* 54 NY2d 880; *Dattner v Pokoik,* 81 AD2d 572, *appeal dismissed* 54 NY2d 750; *Faulk v Aware, Inc.,* 19 AD2d 464, *affd* 14 NY2d 899). Because the jury's $10 million punitive damage award bears no reasonable relation to the harm done, nor to the flagrancy of the conduct causing it *(see, Rupert v Sellers,* 48 AD2d 265, 269; *I.H.P. Corp. v 210 Cent. Park S. Corp.,* 16 AD2d 461, 467, *affd* 12 NY2d 329), and because of its inhibiting effect on the news media *(see, Gertz v Robert Welch, Inc., supra),* it is excessive. To hold otherwise would be to disregard our duty to safeguard " 'the free press against undue interference' " *(Immuno AG. v Moor-Jankowski,* 77 NY2d 235, 249, *cert denied* — US —, 114 L Ed 2d 713, quoting *O'Neill v Oakgrove Constr.,* 71 NY2d 521, 529).

CALLAHAN, J. P., and BOEHM, J., concur with GREEN, J.; LAWTON, J., dissents and votes to reverse in a separate opinion in which DOERR, J., concurs.

Judgment affirmed, with costs.