Levine, J.
(concurring in part and dissenting in part). I agree with the majority that Supreme Court’s error in charging the jury on the falsity of all of defendant’s television and radio broadcasts of May 7, 1982 requires reversal. I would, however, go further and dismiss plaintiff’s action on the ground that he failed to meet the constitutional burden of proving defendant’s actual malice, i.e., clear and convincing proof that defendant’s broadcast statements were made with knowledge of their falsity or reckless disregard of whether they were false or not (New York Times Co. v Sullivan, 376 US 254, 279-280). The "reckless disregard” form of required scienter has since been further refined to signify that a defamation suit defendant must have made the false statement with a "high degree of awareness of * * * probable falsity” (Garrison v Louisiana, 379 US 64, 74) or must have "entertained serious doubts as to the truth of his publication” (St. Amant v Thompson, 390 US 727, 731). Actual malice for constitutional purposes refers to the defendant’s actual subjective state of mind, although that may be proved by circumstantial evidence (Harte-Hanks Communications v Connaughton, 491 US 657, 668). This Court must undertake an indepen *481 dent review of the record to ensure that the actual malice determination was premised upon clear and convincing proof sufficient to cross the constitutional threshold (id., at 659; Mahoney v Adirondack Publ. Co., 71 NY2d 31, 39).
The majority decision has fairly and comprehensively described the evidence upon which plaintiff relied to prove defendant’s actual malice. The majority has also correctly focused on the states of mind of defendant’s news staff members with respect to two critical broadcasts: (1) the May 7, 1982 noon telecast by defendant’s noon anchor, Cindy DiBiasi, following her telephone conversation with FBI Agent and Media Coordinator John Thurston; and (2) the "retraction” telecast at 6:00 p.m. and 11:00 p.m. the same day, written by defendant’s news director, Steven Ridge, after speaking to DiBiasi, Thurston and the station’s investigative reporter who gave Ridge the name of the actual victim of the beating that was the subject of the news story. Thus, the legal sufficiency of the proof of actual malice in this case hinges principally on the evidence adduced concerning DiBiasi’s state of mind at the time of the noon telecast of May 7 and Ridge’s state of mind in preparing the retraction that was aired that evening.
As to the noon DiBiasi telecast, plaintiff points principally if not solely to the following evidence in order to establish actual malice: (1) the completely speculative way in which other news staffers of defendant had earlier surmised that plaintiff was the victim of the alleged mob beating; (2) the apparent motive of defendant to name some victim, due to defendant’s awareness that a competitor television station had named the victim on an earlier broadcast, and because this story broke during the week when local television popularity ratings were taking place; (3) DiBiasi "lied” to FBI Agent Thurston by stating to him that the "media had” plaintiffs name and she was merely calling for confirmation; and (4) the testimony of FBI Agent Thurston in which he unequivocally denied either giving or confirming plaintiffs name as the beating victim during his telephone conversation with DiBiasi.
Apart from the Thurston testimony, the foregoing evidence was of minimal if nonexistent probative value to establish that, at the time of the noon broadcast, DiBiasi named plaintiff as the victim of the beating (who was then being questioned by the FBI) with a high degree of awareness of the probable falsity of that statement, or that she entertained serious doubts as to its truth. Assuming that it can be inferred *482 that DiBiasi knew of the speculative way her colleagues at the station arrived at plaintiffs name, DiBiasi did not broadcast plaintiff as the victim based on her colleagues’ speculations; undeniably, she went to the FBI which, as the investigating law enforcement agency on the case, was the best possible source of information as to the identity of the victim. Similarly, DiBiasi’s "lie” to Thurston, implying that plaintiff had independently been identified as the victim of the Mafia-related beating and that she merely needed confirmation, cannot be interpreted as anything but a news reporter’s ploy to gain accurate information from the FBI. Thus, these two items of evidence not only are lacking in probative value to establish DiBiasi’s reckless disregard for the true identity of the mob victim; if anything, they have some tendency to show DiBiasi’s conscientiousness in seeking the truth beyond the speculations of her news staff colleagues.
As to the defendant’s "motive” to sensationalize this story during a "sweeps” week determining the ratings upon which the station’s advertising revenues depended, a media defendant’s profit motive such as this is both the weakest and most dangerous (to First Amendment values) kind of evidence upon which to infer actual malice.
"Nor can the fact that the defendant published the defamatory material in order to increase its profits suffice to prove actual malice. The allegedly defamatory statements at issue in the New York Times case were themselves published as part of a paid advertisement. 376 U.S., at 265-266. If a profit motive could somehow strip communications of the otherwise available constitutional protection, our cases from New York Times to Hustler Magazine would be little more than empty vessels.” (Harte-Hanks Communications v Connaughton, 491 US 657, 667, supra.)
Thus, in attempting to establish by clear and convincing evidence that DiBiasi knew at the time of the noon telecast that her identification of plaintiff as the victim was false, or at least had a high degree of awareness of its probable falsity, plaintiff has to rely almost entirely on the testimony of FBI Agent Thurston. It must be kept in mind, however, that DiBiasi consistently maintained from the day of the broadcast through the trial that, after she mentioned plaintiffs name to Thurston in the telephone conversation before the offending *483 noon newscast, he said, "[y]ou can go with that unless I call you back”. Under controlling precedent, no matter how plausible it may be to resolve the direct conflict in DiBiasi’s and Thurston’s testimony on this portion of their conversation in favor of Thurston, the proof is insufficient as a matter of law to establish DiBiasi’s actual malice.
It is pertinent to note at this point that in testifying concerning the critical telephone conversation before the May 7 noon newscast, DiBiasi and Thurston were in agreement that they had discussed the fact that the FBI was investigating a beating of a Niagara Falls restaurant or bar owner who was then being questioned by the Bureau, and also that Thurston conceded that it was "possible” that he promised to get back to DiBiasi if he had any further information. Also, DiBiasi was nearing and thus under the pressure to meet the 11:00 a.m. station deadline for completing copy for the noon newscast and while talking over the telephone to Thurston, was in a room in the station with other staff members. Under these circumstances, it was not enough for plaintiff to prove with convincing clarity that Thurston’s version of the key portion of the telephone conversation was the accurate one. Plaintiff had to prove by clear and convincing evidence that the conditions were such that DiBiasi simply could not have misunderstood Thurston; this plaintiff has failed to do. In this respect, our holding in Mahoney v Adirondack Publ. Co. (71 NY2d 31) is directly on point:
"It may be possible, as the United States Supreme Court has suggested, that proof of falsity will support an inference of actual malice 'when the alleged libel purports to be an eyewitness or other direct account of events that speak for themselves’ (Time, Inc. v Pape, 401 US 279, 285). The Appellate Division held that this case presented such an instance. We disagree. The inference depends for its validity on the premise that the eyewitness could not have perceived and understood anything but the truth. Thus, in reporting something else, the observer must have departed from the truth by design. The underlying premise is valid, however, only if the events were unambiguous and the setting was such that the observer could not have misperceived those events. Such conditions, however, cannot simply be assumed; as the proponent of the inference and the bearer of the burden of *484 proof of actual malice, the plaintiff must demonstrate that they exist. No such showing was made here.” (Id., at 39-40 [emphasis supplied].)
The majority attempts to overcome the seemingly impossible hurdle of finding (on this record) clear and convincing evidence that DiBiasi could not have misunderstood FBI Agent Thurston’s version of what he told her during their telephone conversation on the morning of May 7 by relying on two factors in addition to the evidence I have already discussed: (1) the jury could have inferred from the broadcast the preceding evening of the true beating victim’s name by a rival television station, that DiBiasi or defendant’s news staff intentionally failed to investigate to ascertain the name of the actual beating victim (citing Harte-Hanks Communications v Connaughton, 491 US, at 692, supra); and (2) the strength and probability of Thurston’s testimony as weighed against the improbability of DiBiasi’s testimony and her motive to lie to "minimize and rationalize [her] gross blunder” (majority opn, at 478).
With respect to the failure-to-investigate factor, there is no evidence whatsoever in the record that DiBiasi or any other member of defendant’s news staff was aware of the name of the person the rival station had identified as the beating victim. Defendant’s response to the staff’s knowledge that a rival station had named someone as the beating victim was to have DiBiasi call the FBI, presumably the best source of information on the true identity of the victim. I should not think that defendant was obliged to make any inquiry of the rival station. By contrast, in Harte-Hanks Communications, the defendant newspaper’s editorial director studiously avoided going to the person who was uniquely suited to confirm or refute the charges of plaintiff’s wrongdoing published by that defendant. That failure supported an inference that the defendant newspaper in Harte-Hanks Communications made "a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity of [the] charges” (supra, at 692). No inference can be drawn here that, in calling the FBI DiBiasi was attempting to avoid discovering the true identity of the victim of the beating. As previously discussed, the uncontradicted evidence was that the call was made to obtain a genuine confirmation or denial on whether plaintiff was the victim. For the majority to conclude that defendant’s news staff displayed actual malice by failing to investigate beyond calling the FBI regarding their speculation *485 that plaintiff was the victim seems to me to be nothing more than condemning defendant’s inferior brand of journalism. This clearly is not a constitutionally permissible basis for a finding of actual malice (see, id., at 666).
With respect to the relative strengths of the testimony of FBI Agent Thurston and of DiBiasi, and the latter’s motive to lie to mask her blunder, I would submit that their true relevance is exclusively on the issue of which of the competing versions of the Thurston/DiBiasi telephone conversation of May 7 was correct, and on DiBiasi’s credibility on testifying to her version. Obviously, while DiBiasi may well have been motivated to mask or minimize her misunderstanding of what Thurston said in that conversation (once she later learned of her mistake) when she continued to insist in her testimony that her rendition of the conversation was accurate, she had no motive to conceal a blunder at the time of her May 7 noon telecast, when she was not yet aware of committing that blunder. Put another way, any motive she may have had to cover up the mistake she subsequently discovered is not evidence that DiBiasi was aware of her mistake when it was made.
Likewise, as we have already demonstrated, total acceptance of Thurston’s testimony does not by itself prove DiBiasi’s actual malice at noon on May 7, unless plaintiff proved with convincing clarity that the conditions prevented DiBiasi from misunderstanding Thurston (Mahoney v Adirondack Publ. Co., 71 NY2d 31, supra). This remains so even if a trier of fact could reasonably reject the credibility of DiBiasi’s testimony. In Bose Corp. v Consumers Union of U. S. (466 US 485) (discussed, infra), a decision relied upon by this Court in Mahoney, the Supreme Court found legally insufficient to establish actual malice the trial court’s total rejection of the credibility of the testimony of the author of the defamatory article that was the subject of the suit. Its reasoning applies to DiBiasi’s purported lack of credibility as establishing her actual malice here:
"When the testimony of a witness is not believed, the trier of fact may simply disregard it. Normally the discredited testimony is not considered a sufficient basis for drawing a contrary conclusion. * * * In this case the trial judge found it impossible to believe that Seligson continued to maintain that the word 'about’ meant 'across.’ Seligson’s *486 testimony does not rebut any inference of actual malice that the record otherwise supports, but it is equally clear that it does not constitute clear and convincing evidence of actual malice. Seligson displayed a capacity for rationalization. He had made a mistake and when confronted with it, he refused to admit it and steadfastly attempted to maintain that no mistake had been made — that the inaccurate was accurate. That attempt failed, but the fact that he made the attempt does not establish that he realized the inaccuracy at the time of publication” (id., at 512 [emphasis supplied]).
Thus, after giving plaintiff the benefit of resolving all actually outstanding issues of credibility in his favor and of all favorable inferences on the evidence, I have concluded that his proof of defendant’s actual malice regarding the DiBiasi May 7 noon newscast fails to meet the constitutional standard.
I turn, then, to the offending broadcasts of 6:00 p.m. and 11:00 p.m. of May 7, 1982, the copy for which was prepared by Ridge, defendant’s news director, wherein, during the station’s retraction of its prior identification of plaintiff as the beating victim, it was stated, ”[t]he FBI earlier today said and confirmed the victim was Prozeralik”. Plaintiff’s evidence of Ridge’s actual malice when he drafted that statement was as follows: (1) FBI Agent Thurston personally told Ridge after the noon broadcast that he had not identified plaintiff nor confirmed him as the victim in talking to DiBiasi; (2) defendant’s investigative reporter furnished Ridge with the name of the true victim; and (3) even in DiBiasi’s version of her conversation with Thurston, he did not say that plaintiff was the victim; at most, he confirmed it. Again keeping in mind that DiBiasi steadfastly insisted on the accuracy of her version of the telephone conversation with Thurston on the morning before the broadcasts, I find little of probative value regarding Ridge’s actual malice in the fact that Thurston gave him his contradictory version of that conversation, or in Ridge’s by then awareness that plaintiff was not involved in the beating incident. DiBiasi never claimed that she had any source for identifying plaintiff as the victim other than what she was told by Thurston, so the fact that plaintiff was not the victim had no tendency to undermine DiBiasi’s credibility in the eyes of her supervisor. Moreover, Ridge was not presumptively obliged to accept Thurston’s denial of his own reporter’s *487 rendition of the conversation, at the risk of a jury’s concluding that his refusal to do so demonstrated actual malice. As stated in Edwards v National Audubon Socy. (556 F2d 113):
"Surely liability under the 'clear and convincing proof standard of New York Times v. Sullivan cannot be predicated on mere denials, however vehement; such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error” (id., at 121).
Plaintiff did not submit any other evidence of clear and convincing clarity that even would have been expected to cast serious doubt in Ridge’s mind on the credibility of DiBiasi’s description of her telephone conversation with Thurston, or on that reporter’s integrity. In this respect, the instant case stands in stark contrast to Harte-Hanks Communications v Connaughton (supra). In Harte-Hanks Communications, the defendant newspaper’s informant’s version of the facts was not only contradicted by the plaintiff — the person the informant accused of wrongdoing — but by all the other witnesses to the relevant events, and the informant’s veracity was seriously undermined by several other pieces of objectively established undisputed evidence (id., at 691-692).
Thus, as to the retraction telecasts, the only truly damning evidence of News Director Ridge’s actual malice was that his statement in the retraction story that the FBI had earlier that day "said and confirmed” that plaintiff was the victim of the beating deviated literally from DiBiasi’s version, that she first mentioned plaintiff’s name as the beating victim, in response to which Thurston said, "[y]ou can go with that unless I call you back”. Plaintiff thus contends that, at the least, Ridge knew the falsity of the portion of the retraction broadcasts in which it was averred that the FBI "said” that plaintiff was the victim.
Basing a finding of Ridge’s actual malice on the inaccuracy of his characterization of Thurston’s "[y]ou can go with that [i.e., using plaintiff’s name as the victim] unless I call you back”, as an express statement by the FBI that plaintiff was the victim, however, runs into direct conflict with the Supreme Court’s holdings in Bose Corp. v Consumers Union of U. S. (466 US 485, supra) and Time, Inc. v Pape (401 US 279). Bose Corp. was a product disparagement suit arising out of a critical review of the plaintiff’s stereo loudspeakers in the *488 magazine Consumer Reports. The article characterized the sound of music played through plaintiffs speakers as having the negative quality of tending "to wander about the room”. In his testimony at the trial, however, the author of the article made a sketch of the movement he claimed to have heard during his testing of plaintiffs speakers, which actually depicted a movement of sound back and forth along the wall between the two speakers (apparently a common trait of good quality sound systems). This misdescription of the sound as "wander[ing] about the room” was the basis of the lower court’s finding of actual malice (Bose Corp. v Consumers Union of U. S., supra, at 496-498).
In Time, Inc. v Pape, an issue of Time magazine contained an article on a volume of a 1961 report of the United States Commission on Civil Rights partly devoted to its study of the incidence of police brutality. The Commission’s study referred to a pending civil rights suit in which the complaint alleged that Pape, as a commanding officer in the Chicago Police Department, had mistakenly authorized and brutally executed a raid on the apartment of an innocent family. The Time article discussed that portion of the Civil Rights Commission’s study, but omitted mention that the Commission’s text expressly stated that it was describing allegations in the civil rights suit. Pape’s suit against Time, Inc. was based on the theory that, in omitting any indication that the Commission’s description of the incident was expressly based upon the allegations in a pending lawsuit, the Time article implied that the Commission had investigated the incident and found that the facts, rather than only alleged, were indeed true. The lower court found a triable issue of fact on the question of Time’s actual malice, since Time’s writer and editor of the article admitted that they knowingly omitted "alleged” in the article’s version of the Commission’s study. The Time staffers claimed, however, that they read the Commission’s study as a whole as implicitly endorsing those allegations (Time, Inc. v Pape, supra, at 289).
In Bose Corp., the Supreme Court concluded that the defendant author’s obvious misdescription of the sound movement he heard did not demonstrate consciousness of falsity or reckless disregard for the truth, essentially because the phenomenon that the author of the Consumer Reports article heard was sufficiently ambiguous so as to pose a descriptive *489 challenge to the writer and be subject to a number of alternative rational interpretations by him (Bose Corp. v Consumers Union of U. S., supra, at 512). Viewed in that light, the Court held that "[t]he statement in this case represents the sort of inaccuracy that is commonplace in the forum of robust debate to which the New York Times rule applies” (id,., at 513) and that the misdescription of that phenomenon "fits easily within the breathing space that gives life to the First Amendment” (id., at 513).
Likewise, in Time, Inc. v Pape, the Court rejected the conclusion that actual malice of Time magazine was established by its admittedly intentional omission of "alleged” in relating the Civil Rights Commission’s treatment of the incident in question. "Time’s omission of the word 'alleged’ amounted to the adoption of one of a number of possible rational interpretations of a document that bristled with ambiguities. The deliberate choice of such an interpretation, though arguably reflecting a misconception, was not enough to create a jury issue of 'malice’ under New York Times” (Time, Inc. v Pape, supra, at 290). Because "a vast amount of what is published in the daily and periodical press purports to be descriptive of what somebody said rather than of what anybody did” (id., at 285 [emphasis in the original]), errors of interpretation in reporting on what somebody said are entitled to the same constitutional zone of protection that New York Times Co. v Sullivan created for errors of fact (401 US, at 291).
In my view, the teachings of Bose Corp. and Time, Inc. v Pape directly apply to News Director Ridge’s characterization of DiBiasi’s version of the conversation with FBI Agent Thurston, i.e., as one in which the FBI had earlier "said and confirmed”, rather than merely confirmed, that plaintiff was the victim of the suspected mob-related beating. Whether looked at as an error in description, as in Bose Corp., or an error in interpretation, as in Time, Inc. v Pape, Ridge’s minor deviation from DiBiasi’s version of the conversation with Thurston, having little if any demonstrable effect on the meaning of the offending news broadcast or its defamatory content, also "fits easily within the breathing space that gives life to the First Amendment” (Bose Corp. v Consumers Union of U. S., supra, at 513).
*490 Accordingly, I vote to reverse and dismiss plaintiffs complaint.
Chief Judge Kaye and Judges Simons, Titone, Hancock, Jr., and Smith concur with Judge Bellacos a; Judge Levine dissents in part in a separate opinion.
Order reversed, etc.