82 N.Y.2d 466 (1993)
626 N.E.2d 34
605 N.Y.S.2d 218
John Prozeralik, Respondent,
v.
Capital Cities Communications, Inc., Appellant.
Court of Appeals of the State of New York.
Argued October 12, 1993.
Decided November 23, 1993.
Cahill Gordon & Reindel, New York City (Floyd Abrams and Amy Glickman of counsel), Jaeckle, Fleischmann & Mugel, Buffalo (Ralph L. Halpern and Andrea R. Moore of counsel), and David L. Westin, New York City, and Marian D. Lindberg for appellant.
Cadwalader, Wickersham & Taft, New York City (John J. Walsh of counsel), Frank R. Bayger, Buffalo, and Sullivan, Benatovich, Oliverio & Trimboli, Buffalo (Richard T. Sullivan of counsel), for respondent.
Sabin, Bermant & Gould, New York City (Ralph P. Huber of counsel), Rogers & Wells (Richard N. Winfield, David A. Schulz, Thomas J. Lilly and Hilary Lane of counsel), Douglas P. Jacobs, Helen M. Gold, Stuart D. Karle, Muriel H. Reis, Barbara W. Wall, of the Virginia Bar, admitted pro hac vice, Robert J. Hawley, New York City, George Freeman, Harry M. Johnston III, Robin Bierstedt, Nicholas J. Jollymore, Henry L. Baumann and Steven A. Bookshester, of the District of Columbia Bar, admitted pro hac vice, Roberta Brackman, New York City, Alberto Ibarguen, Melville, Ren P. Milam, of the Virginia Bar, admitted pro hac vice, Tina A. Ravitz, New York City, Kenneth M. Vittor, Slade R. Metcalf, Chad E. Milton, of the Missouri Bar, admitted pro hac vice, Jane E. Kirtley, of the District of Columbia Bar, admitted pro hac vice, and Lankenau, Kovner & Kurtz, New York City (Victor A. Kovner of counsel), for Advance Publications, Inc., and others, amici curiae.
Chief Judge KAYE and Judges SIMONS, TITONE, HANCOCK, JR., and SMITH concur with Judge BELLACOSA; Judge LEVINE dissents in part in a separate opinion.
*470 BELLACOSA, J.
In this defamation action, the plaintiff public figure won a multimillion dollar jury verdict against defendant, owner of a radio and television station. The Appellate Division affirmed the judgment by a 3 to 2 vote and defendant appealed as of right. We conclude that the order should be reversed and a new trial ordered, for the sole reason that the trial court's instructions to the jury on the falsity issue, involving particularly the retraction of earlier broadcasts, impermissibly withdrew from the jury crucial interrelated issues of credibility and actual malice that are solely the province of the fact finders.
On May 6, 1982, an abduction and beating occurred in the area serviced by the defendant's television and radio stations. The next day, a report of the incident was broadcast during the defendant's noon news telecast and during the 12:45 P.M., 1:45 P.M. and 2:45 P.M. news segments over defendant's radio station. The news report consisted of the following statement:
"The FBI is investigating a beating and abduction in Cheektowaga last night. Today, investigators are questioning John Prozeralik, the owner of John's Flaming Hearth Restaurant, in Niagara Falls, New York. Prozeralik was either tricked or forced to the Howard Johnson's in Cheektowaga according to police, where he was beaten with a baseball bat or pipe, and tied up. Today, the FBI is *471 investigating the possibility that Prozeralik owed money to organized crime figures."
Shortly after the noon broadcast, plaintiff and his attorneys notified defendant that plaintiff was not the victim in this story. Defendant then verified that the actual victim was one David Pasquantino. It broadcast the following retraction during its 6:00 P.M. and 11:00 P.M. televised newscasts:
"Tonight, we have developments on two fronts in the abduction that ended yesterday in a Cheektowaga motel. First, the victim is not, and I repeat, is not, John Prozeralik, the operator of John's Flaming Hearth Restaurants. The FBI earlier today said and confirmed the victim was Prozeralik, but our independent investigation is revealing he was not involved" (emphasis added).
Plaintiff's action alleged that defendant's noon, 6:00 P.M. and 11:00 P.M. televised newscasts and its 12:45 P.M., 1:45 P.M. and 2:45 P.M. radio broadcasts defamed him. At trial, plaintiff established that his name was first introduced as the possible victim during defendant's employees' discussion on the morning of the broadcasts. A reporter testified that during their meeting and conversation regarding the incident and the possible identity of the victim, who was thought to be a Niagara restaurateur, one of the reporters said, "I wonder if it was John Prozeralik. * * * That's the first name that comes to mind." This was a purely speculative query with no basis in fact, investigation or information acquired by defendant. The only connection was that Prozeralik happened to be one of many Niagara restaurateurs.
Defendant's noon anchor, DiBiasi, used this supposition to inquire of the FBI whether this Prozeralik name could be that of the victim. The testimony of DiBiasi and the FBI's media coordinator, Agent Thurston, as to what transpired between them during this telephone call differs sharply. DiBiasi testified that she mentioned Prozeralik's name to Thurston, and he told her, "You can go with that unless I call you back." Thurston unequivocally denied making any such statement. He testified that he did not give or confirm Prozeralik's name. He did not tell DiBiasi she could go with Prozeralik's name if he did not call back. Moreover, he never used that methodology in dealing with the press. He added that he may have told her only that he would call her back if something developed.
The evidence at trial also revealed that after plaintiff and *472 his attorneys contacted the station, defendant's news director, Ridge, also called Thurston. Thurston informed Ridge that he had not known the name of the victim when he spoke to DiBiasi and that he did not confirm Prozeralik's name. The proof at trial showed that plaintiff's reputation was grievously damaged and his various, substantial and law-abiding business interests were ruined.
The trial court instructed the jury, over defendant's objection, that the initial broadcasts and the retraction were false as a matter of law. The jury returned a verdict in Prozeralik's favor in the amount of $18 million, which was reduced to a judgment in the amount of $15.5 million; $5.5 million in financial loss and $10 million in punitive damages. On this appeal from the Appellate Division affirmance, the defendant contends that the trial court erred when it instructed the jury that the retraction was false as a matter of law; that plaintiff did not prove actual malice; that the award of punitive damages must be set aside, since there was no showing of common-law malice; and that the damages award is excessive.

I.
The erroneous jury instruction on the issue of falsity requires reversal and new trial. Defendant demonstrates that the jury instructions impermissibly impinged on the jury's resolution of credibility and actual malice by, in effect, directing the jury to accept FBI Agent Thurston's version of the telephone conversation between him and DiBiasi. In pertinent part, the jury was instructed that:
"In the case presently being tried before you, I have determined as a matter of law that the defendant in its May 7th, 1982, 12 noon television broadcasts and its similar May 7, 1982, radio broadcasts and in its May 7th, 1982, 6 p.m. and 11 p.m. television broadcasts made certain false statements about the plaintiff which it communicated to its viewing and listening audience. This means that it will not be necessary for you to decide whether or not the plaintiff has proved those elements of his libel case."
This is not some isolated, insignificant feature of the case. It cuts to the heart of the critical elements necessary to prevail in such cases.
*473 Under well-established principles of law, a plaintiff in a defamation action "has the burden of showing the falsity of factual assertions" (Immuno AG. v Moor-Jankowski, 77 N.Y.2d 235, 245 [citations omitted], cert denied 500 US 954). Defendant does not dispute that Prozeralik was not the victim and, accordingly, there was no error in instructing that the initial broadcasts were false as a matter of law. But whether Thurston had "said" or "confirmed" that Prozeralik was the victim or DiBiasi could have reasonably understood him to say so, is a feature of the case on which defendant is entitled to fact finder resolution. As to that, the jury should have been given the choice of accepting or rejecting the whole or parts of the testimony of Thurston and DiBiasi, including in the context of and in relation to the later telephone call between Ridge and Thurston.
It is well settled that "[a]ssessment of the weight of the evidence and the credibility of witnesses is a function of the finder of fact" (Dominguez v Manhattan & Bronx Surface Tr. Operating Auth., 46 N.Y.2d 528, 534). By instructing the jury that the retraction was false as a matter of law, the trial court withdrew that function from the jury and resolved the critical issue of whether the defendant "realized that [its] statement was false or * * * subjectively entertained serious doubt as to the truth of [its] statement" (Bose Corp. v Consumers Union of U. S., 466 US 485, 511, n 30). The court effectively directed the jury's verdict by allowing it to disregard DiBiasi's testimony as incredible and to accept Thurston's testimony that he had not confirmed Prozeralik's name to her. That DiBiasi could not have reasonably believed that Thurston had confirmed the plaintiff's name is a reasonable inference from the court's directive. In effect, mandating a verdict on such determinative issues altered the crucial balance and rules by which such cases must be adjudicated (compare, PJI 3:27 [1992 Supp]).
Since the trial court failed to tender to the jury its full range of fact-finding options in regard to the retraction and the conversation between Thurston and DiBiasi, we have no choice but to reverse and order a new trial.

II.
We must next address defendant's argument seeking outright dismissal of plaintiff's case, a view urged by the dissenting *474 Justices at the Appellate Division and by the partial dissent in this Court.
By stipulation of the parties, plaintiff is a public figure. To prevail in a defamation suit, he would have to prove with evidence of "convincing clarity" "that the statement was made with `actual malice'  that is, with knowledge that it was false or with reckless disregard of whether it was false or not" (New York Times Co. v Sullivan, 376 US 254, 285-286, 279-280; see also, Harte-Hanks Communications v Connaughton, 491 US 657, 659). This rule was promulgated in recognition "of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on [public figures]" (New York Times Co. v Sullivan, 376 US, at 270, supra). "The burden of proving `actual malice' requires the plaintiff to demonstrate with clear and convincing evidence that the defendant realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement" (Bose Corp. v Consumers Union of U. S., 466 US 485, 511, n 30, supra). The Supreme Court has emphasized "that the actual malice standard is not satisfied merely through a showing of ill will or `malice' in the ordinary sense of the term" (Harte-Hanks Communications v Connaughton, 491 US, at 666, supra). It must be established that the "defendant * * * made the false publication with a `high degree of awareness of . . . probable falsity' * * * or must have `entertained serious doubts as to the truth of his publication'" (id., at 667).
On appeal in such cases, courts have "a constitutional duty to `exercise independent judgment and determine whether the record establishes actual malice with convincing clarity'" (id., at 659 [emphasis added]).
"[J]udges * * * must exercise such review in order to preserve the precious liberties established and ordained by the Constitution. The question whether the evidence in the record in a defamation case is of the convincing clarity required to strip the utterance of First Amendment protection is not merely a question for the trier of fact. Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional *475 threshold that bars the entry of any judgment that is not supported by clear and convincing proof of `actual malice'" (Bose Corp. v Consumers Union of U. S., 466 US, at 510-511, supra).
Thus, although this Court is "usually constrained to review only the law and without the power to disturb affirmed findings of fact," we must scrutinize the evidence of actual malice for "convincing clarity" (compare, Mahoney v Adirondack Publ. Co., 71 N.Y.2d 31, 39, with Cohen v Hallmark Cards, 45 N.Y.2d 493, 499).
This heightened review responsibility does not preclude consideration of all of the factual record in full, including "circumstantial evidence" and evidence of the defendant's motive, and the findings of the fact finder (see, Harte-Hanks Communications v Connaughton, 491 US 657, 668, supra). Rather, our review of the Appellate Division's analysis of the trial evidence necessarily encompasses all of these usual factors. We must be sure "undue weight" was not given to the jury's findings in the usual mode and must be satisfied that an "independent review" was conducted.
Mindful of this special review power in the particular procedural framework of this argument by defendant, we conclude that plaintiff met his prima facie evidentiary burden of establishing actual malice sufficient to allow the jury (had it been instructed correctly) to find that defendant acted with a high degree of awareness of "probable falsity" or entertained "serious doubts" as to the truth of the broadcasts (Harte-Hanks Communications v Connaughton, 491 US, at 688, supra). Plaintiff adduced cogent direct evidence from which a jury could have inferred that defendant knew or suspected that the Prozeralik was not the victim in this story. It is undisputed that the actual victim, David Pasquantino, had been correctly identified by name in the May 6th 11:00 P.M. broadcast of a rival television station  the night before defendant's broadcasts. The stations were engaged in their market "sweeps" competition at the time. Uncontroverted testimony from defendant's own witnesses showed that the only reason defendant's news employees speculated about plaintiff's name, without any basis or source whatsoever, was because they believed that the organized crime abduction victim was a Niagara restaurateur. Prozeralik was one of countless restaurateurs in the region but had no connection whatsoever to the crime, the criminal or the story, except for defendant's employees' *476 rootless speculation and then glaring projection of his name into the public's eye.
Thurston emphatically denied that he had told DiBiasi that if he did not call her back she could go with Prozeralik's name. He added that during his tenure as upstate New York media coordinator for the FBI, he had never told a reporter to treat a no-call-back as a confirmation of a fact inquired about in a reporter-initiated telephone call. News Director Ridge testified that before he aired the retraction he, too, had spoken to FBI Agent Thurston, who denied to him confirming Prozeralik's name to DiBiasi. Yet, the "retraction" repeated that the FBI had earlier told the station that Prozeralik was the victim. While falsity alone and negligence alone would not be sufficient to sustain plaintiff's burden, there is enough in this case to submit the issue of actual malice to a jury for factual resolution.
It is important at this juncture to note that this case is sufficiently distinguishable from Mahoney v Adirondack Publ. Co. (71 N.Y.2d 31, supra), so heavily relied upon by defendant and the partial dissent, so as to withstand and avoid its broad precedential impact. There, defendant had run a story in the sports section of its newspaper in which a reporter, who had witnessed a local high school football game, reported that the coach had "verbally abused" the players. The reporter based his article on statements that he had allegedly heard. The evidence at trial established that the plaintiff had not uttered the sentence attributed to him ("get your head out of your &!(!!(&"); although what he said was similar ("get your head up") (id., at 37-38). The plaintiff, the player to whom he was speaking and the player's father, all testified as to what was actually said. Additional witnesses testified "that they did not hear plaintiff use profane language" (Mahoney v Adirondack Publ. Co., 71 NY2d, at 40, supra). This Court found that although the evidence supported the jury's falsity finding, "[t]here was no evidence [as to actual malice] to negate the possibility that [the reporter] simply misunderstood plaintiff" (id., at 40). Significantly, "[t]here was no direct evidence that [the reporter] or his employer knew or suspected the plaintiff did not utter the words attributed to him in the article" (id., at 39). There was nothing outside the parties' differing versions of the incident to support the jury's conclusion that the coach's testimony was accurate and the reporter's version was inaccurate. Moreover, there was no evidence to support the jury's conclusion that the reporter knew or should have *477 known that his understanding of what happened was false. On the contrary, it was more than likely that observers hearing the statement from different locations during the noise and confusion of a high school football game would differ in their understanding of the coach's remarks. Thus, the evidence in Mahoney did not meet constitutional standards for establishing that the reporter knew or suspected that his version of events was inaccurate. Therefore, we reversed the Appellate Division and held that actual malice had not been established as a matter of law.
The evidence and context in the instant case cogently present a decidedly different and stronger case than Mahoney. A highly and significantly discrete feature of this case is the uncontroverted evidence that the plaintiff's name was initially injected randomly by defendant's own employees merely because he happened to be a Niagara restaurateur. Direct evidence was presented here from which the jury was entitled to infer and find that the defendant "knew or suspected" that Prozeralik was not the victim. Strikingly here, Agent Thurston gave categorical testimony that he had not confirmed Prozeralik's name and that he never used the no-call-back method to confirm a factual inquiry from the media.
For assessing the prima facie proof burden to get to a jury, even within the special heightened appellate review standard, this Court may include in its over-all consideration the strengths and weaknesses of the whole evidentiary record. The heightened test cannot compel the reviewing court to deprive plaintiff of his right to a jury resolution in these circumstances. In answering defendant's argument that the Court should dismiss as a matter of law, we should also consider, along with everything else, the high improbability of defendant's explanation as it was offered in the face of Thurston's testimony on some key facts. For example, the context of his version of events includes that the truth was objectively verifiable, since the name of the actual victim had already been transmitted across defendant's competitor's airwaves, thus contradicting defendant's story that Thurston officially implicated Prozeralik in some way to defendant (see, Harte-Hanks Communications v Connaughton, 491 US, at 692, supra ["Although failure to investigate will not alone support a finding of actual malice * * * the purposeful avoidance of the truth is in a different category"]). This adds an independently objective verifying feature, not present in Mahoney (71 N.Y.2d 31, supra). Next, DiBiasi's central claim was contrary to *478 Thurston's standard practice in dealing with reporters. As we have observed, he had virtually no motive to lie, contrasted to defendant's employees' motivation to minimize and rationalize their gross blunder. Lastly, for Thurston to falsely report and testify in this matter would place him in direct violation of his sworn public duties for no reason beneficial to him or the FBI.
Despite the improbabilities, defendant would have this Court conclude that no prima facie case was even presented because its employees might have held an untarnished subjective state of mind. That approach and analysis is not constitutionally compelled by Bose (466 US 485, supra) or Mahoney (71 N.Y.2d 31, supra), and it would erect a logically impossible test which, by its practical application of governing precedents, would inevitably result in no defamation case ever qualifying for jury resolution. The outcome of these complex, difficult and sensitively nuanced controversies cannot be that rigid or one-sided. Nor as a practical matter should such dispositions be placed into the unilateral control of defendants. Under the facts and circumstances of this case, enough evidence was adduced to convince us with the requisite clarity and cogency that the jury was rightly given the obligation of resolving credibility and the competing versions of what happened.
Thus, since there was sufficient and convincingly clear evidence to warrant submitting the case to the jury for its assessment of actual malice and liability, plaintiff's case should not be dismissed.

III.
It is incumbent upon the Court also to address the punitive damages issue. In Mahoney v Adirondack Publ. Co., this Court did not have to decide "whether plaintiff's proof of commonlaw malice was sufficient to sustain [an award of punitive damages] or whether punitive damages are ever recoverable in [defamation] actions involving [public figures]" (71 N.Y.2d 31, 41, supra). Were we not ordering a new trial, we might be bound by a law-of-the-case-unobjected-to instruction to the jury on the issue. The trial court gave the following jury instruction on punitive damages:
"[P]unitive damages may be awarded to punish a defendant who * * * has acted maliciously and to discourage others from doing the same. * * * A statement is made maliciously if it is made with deliberate intent to injure or with a wanton and *479 reckless disregard of its truth and its injurious effect upon the person upon whom it was made. * * * If you find that the defendant's employees knew the statements in its broadcast were false or the information received by the defendant's employees from Agent Thurston did not tend to establish the truth of the statements contained in the broadcasts or that the broadcasts did not accurately and completely state the information received from Agent Thurston, after considering all the evidence, you may find that the defendant's employees acted with malice".
This instruction does not fully or accurately inform the jury of the principles governing this important segment of such cases (see, PJI 3:38). Under the procedural circumstances of this case, we note our disagreement with the instruction given, so as to provide guidance on the new trial and to settle the issue for future cases.
Punitive damages are awarded in tort actions "[w]here the defendant's wrongdoing has been intentional and deliberate, and has the character of outrage frequently associated with crime" (Prosser and Keeton, Torts § 2, at 9 [5th ed 1984]). That author also teaches that:
"Something more than the mere commission of a tort is always required for punitive damages. There must be circumstances of aggravation or outrage, such as spite or `malice,' or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that the conduct may be called wilful or wanton" (Prosser and Keeton, Torts § 2, at 9-10 [5th ed 1984]).
Actual malice, as defined in New York Times Co. v Sullivan (376 US 254, supra), is insufficient by itself to justify an award of punitive damages, because that malice focuses on the defendant's state of mind in relation to the truth or falsity of the published information (see, e.g., McCoy v Hearst Corp., 42 Cal 3d 835, 727 P2d 711, 736 [1986], cert denied 481 US 1041; compare, Liberman v Gelstein, 80 N.Y.2d 429, 437). This does not measure up to the level of outrage or malice underlying the public policy which would allow an award of punitive damages, i.e., "to punish a person for outrageous conduct which is malicious, wanton, reckless, or in willful disregard *480 for another's rights" (Vassiliades v Garfinkle's, Brooks Bros., 492 A2d 580, 593 [DC]; see also, Liberman v Gelstein, 80 N.Y.2d 429, supra; Hartford Acc. & Indem. Co. v Village of Hempstead, 48 N.Y.2d 218, 227). This kind of common-law malice focuses on the defendant's mental state in relation to the plaintiff and the motive in publishing the falsity  the pointed factors that punitive damages are intended to remedy.
While theoretically, and upon proof and instructions, punitive damages may be available in such cases, the evidence on this record did not support the conclusion that Prozeralik was reported as the victim of this violent crime out of hatred, ill will, spite, criminal mental state or that traditionally required variety of common-law malice. Whether that could be shown on the new trial remains to be seen and demonstrated.

IV.
The other issues in the case, to the extent reviewable, warrant no further discussion.
Accordingly, the order of the Appellate Division should be reversed and a new trial ordered, with costs to abide the event.
LEVINE, J. (concurring in part and dissenting in part).
I agree with the majority that Supreme Court's error in charging the jury on the falsity of all of defendant's television and radio broadcasts of May 7, 1982 requires reversal. I would, however, go further and dismiss plaintiff's action on the ground that he failed to meet the constitutional burden of proving defendant's actual malice, i.e., clear and convincing proof that defendant's broadcast statements were made with knowledge of their falsity or reckless disregard of whether they were false or not (New York Times Co. v Sullivan, 376 US 254, 279-280). The "reckless disregard" form of required scienter has since been further refined to signify that a defamation suit defendant must have made the false statement with a "high degree of awareness of * * * probable falsity" (Garrison v Louisiana, 379 US 64, 74) or must have "entertained serious doubts as to the truth of his publication" (St. Amant v Thompson, 390 US 727, 731). Actual malice for constitutional purposes refers to the defendant's actual subjective state of mind, although that may be proved by circumstantial evidence (Harte-Hanks Communications v Connaughton, 491 US 657, 668). This Court must undertake an independent *481 review of the record to ensure that the actual malice determination was premised upon clear and convincing proof sufficient to cross the constitutional threshold (id., at 659; Mahoney v Adirondack Publ. Co., 71 N.Y.2d 31, 39).
The majority decision has fairly and comprehensively described the evidence upon which plaintiff relied to prove defendant's actual malice. The majority has also correctly focused on the states of mind of defendant's news staff members with respect to two critical broadcasts: (1) the May 7, 1982 noon telecast by defendant's noon anchor, Cindy DiBiasi, following her telephone conversation with FBI Agent and Media Coordinator John Thurston; and (2) the "retraction" telecast at 6:00 P.M. and 11:00 P.M. the same day, written by defendant's news director, Steven Ridge, after speaking to DiBiasi, Thurston and the station's investigative reporter who gave Ridge the name of the actual victim of the beating that was the subject of the news story. Thus, the legal sufficiency of the proof of actual malice in this case hinges principally on the evidence adduced concerning DiBiasi's state of mind at the time of the noon telecast of May 7 and Ridge's state of mind in preparing the retraction that was aired that evening.
As to the noon DiBiasi telecast, plaintiff points principally if not solely to the following evidence in order to establish actual malice: (1) the completely speculative way in which other news staffers of defendant had earlier surmised that plaintiff was the victim of the alleged mob beating; (2) the apparent motive of defendant to name some victim, due to defendant's awareness that a competitor television station had named the victim on an earlier broadcast, and because this story broke during the week when local television popularity ratings were taking place; (3) DiBiasi "lied" to FBI Agent Thurston by stating to him that the "media had" plaintiff's name and she was merely calling for confirmation; and (4) the testimony of FBI Agent Thurston in which he unequivocally denied either giving or confirming plaintiff's name as the beating victim during his telephone conversation with DiBiasi.
Apart from the Thurston testimony, the foregoing evidence was of minimal if nonexistent probative value to establish that, at the time of the noon broadcast, DiBiasi named plaintiff as the victim of the beating (who was then being questioned by the FBI) with a high degree of awareness of the probable falsity of that statement, or that she entertained serious doubts as to its truth. Assuming that it can be inferred *482 that DiBiasi knew of the speculative way her colleagues at the station arrived at plaintiff's name, DiBiasi did not broadcast plaintiff as the victim based on her colleagues' speculations; undeniably, she went to the FBI which, as the investigating law enforcement agency on the case, was the best possible source of information as to the identity of the victim. Similarly, DiBiasi's "lie" to Thurston, implying that plaintiff had independently been identified as the victim of the Mafia-related beating and that she merely needed confirmation, cannot be interpreted as anything but a news reporter's ploy to gain accurate information from the FBI. Thus, these two items of evidence not only are lacking in probative value to establish DiBiasi's reckless disregard for the true identity of the mob victim; if anything, they have some tendency to show DiBiasi's conscientiousness in seeking the truth beyond the speculations of her news staff colleagues.
As to the defendant's "motive" to sensationalize this story during a "sweeps" week determining the ratings upon which the station's advertising revenues depended, a media defendant's profit motive such as this is both the weakest and most dangerous (to First Amendment values) kind of evidence upon which to infer actual malice.
"Nor can the fact that the defendant published the defamatory material in order to increase its profits suffice to prove actual malice. The allegedly defamatory statements at issue in the New York Times case were themselves published as part of a paid advertisement. 376 U.S., at 265-266. If a profit motive could somehow strip communications of the otherwise available constitutional protection, our cases from New York Times to Hustler Magazine would be little more than empty vessels." (Harte-Hanks Communications v Connaughton, 491 US 657, 667, supra.)
Thus, in attempting to establish by clear and convincing evidence that DiBiasi knew at the time of the noon telecast that her identification of plaintiff as the victim was false, or at least had a high degree of awareness of its probable falsity, plaintiff has to rely almost entirely on the testimony of FBI Agent Thurston. It must be kept in mind, however, that DiBiasi consistently maintained from the day of the broadcast through the trial that, after she mentioned plaintiff's name to Thurston in the telephone conversation before the offending *483 noon newscast, he said, "[y]ou can go with that unless I call you back". Under controlling precedent, no matter how plausible it may be to resolve the direct conflict in DiBiasi's and Thurston's testimony on this portion of their conversation in favor of Thurston, the proof is insufficient as a matter of law to establish DiBiasi's actual malice.
It is pertinent to note at this point that in testifying concerning the critical telephone conversation before the May 7 noon newscast, DiBiasi and Thurston were in agreement that they had discussed the fact that the FBI was investigating a beating of a Niagara Falls restaurant or bar owner who was then being questioned by the Bureau, and also that Thurston conceded that it was "possible" that he promised to get back to DiBiasi if he had any further information. Also, DiBiasi was nearing and thus under the pressure to meet the 11:00 A.M. station deadline for completing copy for the noon newscast and while talking over the telephone to Thurston, was in a room in the station with other staff members. Under these circumstances, it was not enough for plaintiff to prove with convincing clarity that Thurston's version of the key portion of the telephone conversation was the accurate one. Plaintiff had to prove by clear and convincing evidence that the conditions were such that DiBiasi simply could not have misunderstood Thurston; this plaintiff has failed to do. In this respect, our holding in Mahoney v Adirondack Publ. Co. (71 N.Y.2d 31) is directly on point:
"It may be possible, as the United States Supreme Court has suggested, that proof of falsity will support an inference of actual malice `when the alleged libel purports to be an eyewitness or other direct account of events that speak for themselves' (Time, Inc. v Pape, 401 US 279, 285). The Appellate Division held that this case presented such an instance. We disagree. The inference depends for its validity on the premise that the eyewitness could not have perceived and understood anything but the truth. Thus, in reporting something else, the observer must have departed from the truth by design. The underlying premise is valid, however, only if the events were unambiguous and the setting was such that the observer could not have misperceived those events. Such conditions, however, cannot simply be assumed; as the proponent of the inference and the bearer of the burden of *484 proof of actual malice, the plaintiff must demonstrate that they exist. No such showing was made here." (Id., at 39-40 [emphasis supplied].)
The majority attempts to overcome the seemingly impossible hurdle of finding (on this record) clear and convincing evidence that DiBiasi could not have misunderstood FBI Agent Thurston's version of what he told her during their telephone conversation on the morning of May 7 by relying on two factors in addition to the evidence I have already discussed: (1) the jury could have inferred from the broadcast the preceding evening of the true beating victim's name by a rival television station, that DiBiasi or defendant's news staff intentionally failed to investigate to ascertain the name of the actual beating victim (citing Harte-Hanks Communications v Connaughton, 491 US, at 692, supra); and (2) the strength and probability of Thurston's testimony as weighed against the improbability of DiBiasi's testimony and her motive to lie to "minimize and rationalize [her] gross blunder" (majority opn, at 478).
With respect to the failure-to-investigate factor, there is no evidence whatsoever in the record that DiBiasi or any other member of defendant's news staff was aware of the name of the person the rival station had identified as the beating victim. Defendant's response to the staff's knowledge that a rival station had named someone as the beating victim was to have DiBiasi call the FBI, presumably the best source of information on the true identity of the victim. I should not think that defendant was obliged to make any inquiry of the rival station. By contrast, in Harte-Hanks Communications, the defendant newspaper's editorial director studiously avoided going to the person who was uniquely suited to confirm or refute the charges of plaintiff's wrongdoing published by that defendant. That failure supported an inference that the defendant newspaper in Harte-Hanks Communications made "a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity of [the] charges" (supra, at 692). No inference can be drawn here that, in calling the FBI DiBiasi was attempting to avoid discovering the true identity of the victim of the beating. As previously discussed, the uncontradicted evidence was that the call was made to obtain a genuine confirmation or denial on whether plaintiff was the victim. For the majority to conclude that defendant's news staff displayed actual malice by failing to investigate beyond calling the FBI regarding their speculation *485 that plaintiff was the victim seems to me to be nothing more than condemning defendant's inferior brand of journalism. This clearly is not a constitutionally permissible basis for a finding of actual malice (see, id., at 666).
With respect to the relative strengths of the testimony of FBI Agent Thurston and of DiBiasi, and the latter's motive to lie to mask her blunder, I would submit that their true relevance is exclusively on the issue of which of the competing versions of the Thurston/DiBiasi telephone conversation of May 7 was correct, and on DiBiasi's credibility on testifying to her version. Obviously, while DiBiasi may well have been motivated to mask or minimize her misunderstanding of what Thurston said in that conversation (once she later learned of her mistake) when she continued to insist in her testimony that her rendition of the conversation was accurate, she had no motive to conceal a blunder at the time of her May 7 noon telecast, when she was not yet aware of committing that blunder. Put another way, any motive she may have had to cover up the mistake she subsequently discovered is not evidence that DiBiasi was aware of her mistake when it was made.
Likewise, as we have already demonstrated, total acceptance of Thurston's testimony does not by itself prove DiBiasi's actual malice at noon on May 7, unless plaintiff proved with convincing clarity that the conditions prevented DiBiasi from misunderstanding Thurston (Mahoney v Adirondack Publ. Co., 71 N.Y.2d 31, supra). This remains so even if a trier of fact could reasonably reject the credibility of DiBiasi's testimony. In Bose Corp. v Consumers Union of U. S. (466 US 485) (discussed, infra), a decision relied upon by this Court in Mahoney, the Supreme Court found legally insufficient to establish actual malice the trial court's total rejection of the credibility of the testimony of the author of the defamatory article that was the subject of the suit. Its reasoning applies to DiBiasi's purported lack of credibility as establishing her actual malice here:
"When the testimony of a witness is not believed, the trier of fact may simply disregard it. Normally the discredited testimony is not considered a sufficient basis for drawing a contrary conclusion. * * * In this case the trial judge found it impossible to believe that Seligson continued to maintain that the word `about' meant `across.' Seligson's *486 testimony does not rebut any inference of actual malice that the record otherwise supports, but it is equally clear that it does not constitute clear and convincing evidence of actual malice. Seligson displayed a capacity for rationalization. He had made a mistake and when confronted with it, he refused to admit it and steadfastly attempted to maintain that no mistake had been made  that the inaccurate was accurate. That attempt failed, but the fact that he made the attempt does not establish that he realized the inaccuracy at the time of publication" (id., at 512 [emphasis supplied]).
Thus, after giving plaintiff the benefit of resolving all actually outstanding issues of credibility in his favor and of all favorable inferences on the evidence, I have concluded that his proof of defendant's actual malice regarding the DiBiasi May 7 noon newscast fails to meet the constitutional standard.
I turn, then, to the offending broadcasts of 6:00 P.M. and 11:00 P.M. of May 7, 1982, the copy for which was prepared by Ridge, defendant's news director, wherein, during the station's retraction of its prior identification of plaintiff as the beating victim, it was stated, "[t]he FBI earlier today said and confirmed the victim was Prozeralik". Plaintiff's evidence of Ridge's actual malice when he drafted that statement was as follows: (1) FBI Agent Thurston personally told Ridge after the noon broadcast that he had not identified plaintiff nor confirmed him as the victim in talking to DiBiasi; (2) defendant's investigative reporter furnished Ridge with the name of the true victim; and (3) even in DiBiasi's version of her conversation with Thurston, he did not say that plaintiff was the victim; at most, he confirmed it. Again keeping in mind that DiBiasi steadfastly insisted on the accuracy of her version of the telephone conversation with Thurston on the morning before the broadcasts, I find little of probative value regarding Ridge's actual malice in the fact that Thurston gave him his contradictory version of that conversation, or in Ridge's by then awareness that plaintiff was not involved in the beating incident. DiBiasi never claimed that she had any source for identifying plaintiff as the victim other than what she was told by Thurston, so the fact that plaintiff was not the victim had no tendency to undermine DiBiasi's credibility in the eyes of her supervisor. Moreover, Ridge was not presumptively obliged to accept Thurston's denial of his own reporter's *487 rendition of the conversation, at the risk of a jury's concluding that his refusal to do so demonstrated actual malice. As stated in Edwards v National Audubon Socy. (556 F.2d 113):
"Surely liability under the `clear and convincing proof' standard of New York Times v. Sullivan cannot be predicated on mere denials, however vehement; such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error" (id., at 121).
Plaintiff did not submit any other evidence of clear and convincing clarity that even would have been expected to cast serious doubt in Ridge's mind on the credibility of DiBiasi's description of her telephone conversation with Thurston, or on that reporter's integrity. In this respect, the instant case stands in stark contrast to Harte-Hanks Communications v Connaughton (supra). In Harte-Hanks Communications, the defendant newspaper's informant's version of the facts was not only contradicted by the plaintiff  the person the informant accused of wrongdoing  but by all the other witnesses to the relevant events, and the informant's veracity was seriously undermined by several other pieces of objectively established undisputed evidence (id., at 691-692).
Thus, as to the retraction telecasts, the only truly damning evidence of News Director Ridge's actual malice was that his statement in the retraction story that the FBI had earlier that day "said and confirmed" that plaintiff was the victim of the beating deviated literally from DiBiasi's version, that she first mentioned plaintiff's name as the beating victim, in response to which Thurston said, "[y]ou can go with that unless I call you back". Plaintiff thus contends that, at the least, Ridge knew the falsity of the portion of the retraction broadcasts in which it was averred that the FBI "said" that plaintiff was the victim.
Basing a finding of Ridge's actual malice on the inaccuracy of his characterization of Thurston's "[y]ou can go with that [i.e., using plaintiff's name as the victim] unless I call you back", as an express statement by the FBI that plaintiff was the victim, however, runs into direct conflict with the Supreme Court's holdings in Bose Corp. v Consumers Union of U. S. (466 US 485, supra) and Time, Inc. v Pape (401 US 279). Bose Corp. was a product disparagement suit arising out of a critical review of the plaintiff's stereo loudspeakers in the *488 magazine Consumer Reports. The article characterized the sound of music played through plaintiff's speakers as having the negative quality of tending "to wander about the room". In his testimony at the trial, however, the author of the article made a sketch of the movement he claimed to have heard during his testing of plaintiff's speakers, which actually depicted a movement of sound back and forth along the wall between the two speakers (apparently a common trait of good quality sound systems). This misdescription of the sound as "wander[ing] about the room" was the basis of the lower court's finding of actual malice (Bose Corp. v Consumers Union of U. S., supra, at 496-498).
In Time, Inc. v Pape, an issue of Time magazine contained an article on a volume of a 1961 report of the United States Commission on Civil Rights partly devoted to its study of the incidence of police brutality. The Commission's study referred to a pending civil rights suit in which the complaint alleged that Pape, as a commanding officer in the Chicago Police Department, had mistakenly authorized and brutally executed a raid on the apartment of an innocent family. The Time article discussed that portion of the Civil Rights Commission's study, but omitted mention that the Commission's text expressly stated that it was describing allegations in the civil rights suit. Pape's suit against Time, Inc. was based on the theory that, in omitting any indication that the Commission's description of the incident was expressly based upon the allegations in a pending lawsuit, the Time article implied that the Commission had investigated the incident and found that the facts, rather than only alleged, were indeed true. The lower court found a triable issue of fact on the question of Time's actual malice, since Time's writer and editor of the article admitted that they knowingly omitted "alleged" in the article's version of the Commission's study. The Time staffers claimed, however, that they read the Commission's study as a whole as implicitly endorsing those allegations (Time, Inc. v Pape, supra, at 289).
In Bose Corp., the Supreme Court concluded that the defendant author's obvious misdescription of the sound movement he heard did not demonstrate consciousness of falsity or reckless disregard for the truth, essentially because the phenomenon that the author of the Consumer Reports article heard was sufficiently ambiguous so as to pose a descriptive *489 challenge to the writer and be subject to a number of alternative rational interpretations by him (Bose Corp. v Consumers Union of U. S., supra, at 512). Viewed in that light, the Court held that "[t]he statement in this case represents the sort of inaccuracy that is commonplace in the forum of robust debate to which the New York Times rule applies" (id., at 513) and that the misdescription of that phenomenon "fits easily within the breathing space that gives life to the First Amendment" (id., at 513).
Likewise, in Time, Inc. v Pape, the Court rejected the conclusion that actual malice of Time magazine was established by its admittedly intentional omission of "alleged" in relating the Civil Rights Commission's treatment of the incident in question. "Time's omission of the word `alleged' amounted to the adoption of one of a number of possible rational interpretations of a document that bristled with ambiguities. The deliberate choice of such an interpretation, though arguably reflecting a misconception, was not enough to create a jury issue of `malice' under New York Times" (Time, Inc. v Pape, supra, at 290). Because "a vast amount of what is published in the daily and periodical press purports to be descriptive of what somebody said rather than of what anybody did" (id., at 285 [emphasis in the original]), errors of interpretation in reporting on what somebody said are entitled to the same constitutional zone of protection that New York Times Co. v Sullivan created for errors of fact (401 US, at 291).
In my view, the teachings of Bose Corp. and Time, Inc. v Pape directly apply to News Director Ridge's characterization of DiBiasi's version of the conversation with FBI Agent Thurston, i.e., as one in which the FBI had earlier "said and confirmed", rather than merely confirmed, that plaintiff was the victim of the suspected mob-related beating. Whether looked at as an error in description, as in Bose Corp., or an error in interpretation, as in Time, Inc. v Pape, Ridge's minor deviation from DiBiasi's version of the conversation with Thurston, having little if any demonstrable effect on the meaning of the offending news broadcast or its defamatory content, also "fits easily within the breathing space that gives life to the First Amendment" (Bose Corp. v Consumers Union of U. S., supra, at 513).
*490 Accordingly, I vote to reverse and dismiss plaintiff's complaint.
Order reversed, etc.